**FILED**

**OCT 2 6 2018**

Clerk, U.S. District and
Bankruptcy Courts

## ATTACHMENT A

### STATEMENT OF OFFENSE

1. Unless stated otherwise, the relevant time period for this Statement of Offense spans from in or about August 2015 through in or about December 2017.

**A. Vocational Rehabilitation and Employment Program**

2. At all relevant times the United States Department of Veterans Affairs ("VA") was an agency of the United States Government.

3. At all relevant times the Vocational Rehabilitation and Employment ("VR&E") program was a VA program authorized by Congress under Title 38, United States Code, Chapter 31. The VR&E program provided eligible veterans services and assistance necessary to enable them to achieve maximum independence in daily living and to obtain and maintain suitable employment. VR&E program benefits were available to individuals who served in the military after September 16, 1940, and did not receive a dishonorable discharge. In order to qualify for these benefits a veteran must have had a service-connected disability and a serious employment handicap requiring rehabilitation.

4. One type of service offered to qualifying veterans by the VR&E program was educational and vocational training. In cases where educational and vocational training was determined to be necessary for the veteran to accomplish the purposes of the rehabilitation program, the VA paid for tuition, books, supplies, equipment, and other educational costs and fees. See 38 U.S.C. § 3104(a)(7)(A). The VA paid tuition and fees directly to the school on the enrolled veteran's behalf, and sometimes also paid for books, supplies, and equipment directly to the school on the veteran's behalf. Veterans participating in the VR&E program received a subsistence allowance while they pursued an education or training program. The subsistence allowance was a

monthly payment calculated based on the rate of attendance in a training program (full-time, three-quarter-time, or half-time), the number of dependents, and the type of training. See 38 U.S.C. § 3108(b).

5. Each VR&E program vendor that receives tuition payments from the VA was required to designate a School Certifying Official. School Certifying Officials certify the accuracy of information submitted for purposes of payment by the vendor to the VA. For example, school vendors submitted VA Form 28-1905s to certify that veteran students were enrolled in specified classes for specified class hours during specified dates.

**B.   James Edwin King**

6. The defendant, James Edwin King ("KING") was a VR&E program counselor employed by the VA. VR&E program counselors such as KING were responsible for providing rehabilitation and counseling services to veterans. These services included comprehensive evaluations, entitlement determinations, educational counseling, vocational counseling, rehabilitation planning, job placement, and case management. Each counselor was assigned to a certain number of educational institutions. As part of KING's duties as a VR&E program counselor, KING was responsible for advising veterans under his supervision which school they should attend. KING was also responsible for reviewing invoices submitted by VR&E program vendor schools and making a determination as to whether such invoices should be paid.

**C.   The Fraudulent Vendor Schools**

   **I.   Atius Technology Institute**

7. Atius Technology Institute ("Atius") was a privately owned, non-accredited school specializing in information technology courses. Atius was registered to do business in the State of Maryland and the Commonwealth of Virginia. Atius had two campuses, one at an office

2

building at 4715 Sellman Road, Suite G, Beltsville, Maryland, and the other located at an office building at 6320 Augusta Drive, Twelfth Floor, Springfield, Virginia, the latter of which opened in or about March 2017.

8. Albert Poawui ("POAWUI"), was a co-owner or sole owner of Atius, and controlled all of its finances and operations.

9. Beginning in or about October 2016, Sombo Kanneh ("KANNEH") was employed full-time by Atius as its Financial Manager. In her capacity as Financial Manager, KANNEH was responsible for managing Atius's finances.

10. Beginning in or about October 2016, ATIUS EMPLOYEE 1 was employed full-time by Atius as its Program Manager. In his capacity as Program Manager, ATIUS EMPLOYEE 1 was responsible for managing Atius's student enrollment, curriculum, and its correspondence with the VA.

11. POAWUI was Atius's primary School Certifying Official from in or about May 2015 until February 27, 2017, at which time he delegated this role to ATIUS EMPLOYEE 1. As School Certifying Officials, POAWUI and ATIUS EMPLOYEE 1 submitted to the VA invoices reflecting veterans' course schedules, course tuition, and the costs of equipment and supplies that Atius purported to purchase for veterans.

II. Eelon Training Academy

12. Eelon Wellness and Massage and Eelon Training Academy (collectively "Eelon") were privately owned, non-accredited schools purporting to specialize in health and wellness and digital media, respectively. Eelon was registered to do business in the State of Maryland. Beginning no later than in or about 2016 to in or about January 2017, Eelon operated at 3611

Branch Avenue, Suite 207, Temple Hills, Maryland 20748. From in or about January 2017 to in or about January 2018, Eelon operated at 3100 Branch Avenue, Temple Hills, Maryland 20748.

13. Michelle Stevens ("STEVENS") was the sole owner of Eelon, and controlled all of its finances and operations.

### III. School A

14. School A was a privately owned, non-accredited school purporting to specialize in physical security training. School A was registered to do business in the State of Maryland. School A was located in Temple Hills, Maryland.

15. PERSON A owned School A and controlled all of its finances and operations.

### IV. Other Relevant Subject Individuals

16. PUBLIC OFFICIAL 1 was a VR&E program counselor employed by the VA. When KING was not in the office, or when he was otherwise unable to facilitate paperwork needed for the VA to pay Atius, PUBLIC OFFICIAL 1 completed and transmitted such paperwork so that Atius would be paid by the VA. PUBLIC OFFICIAL 1 also referred some students under her supervision to Atius. PUBLIC OFFICIAL 1 took such action while aware of the illicit agreement between POAWUI and KING described below.

17. PERSON B was a veteran enrolled in the VR&E program. KING supervised PERSON B in KING's capacity as a VR&E program counselor. As further described below, PERSON B served as KING's personal assistant for purposes of the scheme.

**The Scheme to Defraud the VA and Commit Bribery**

A. **Purposes of the Scheme**

   18. The purposes of the scheme included, but were not limited to, the following:

      a. For KING to use his official position at the VA to enrich himself through corruption by soliciting, demanding, and accepting things of value from POAWUI, STEVENS, and PERSON A in exchange for KING's official actions favorable to those individuals and their schools;

      b. For POAWUI, STEVENS, PERSON A, and others known and unknown to enrich themselves through corruption, by providing things of value to KING in exchange for KING's official acts, which financially benefitted their schools;

      c. For KING, POAWUI, STEVENS, PERSON A, and others known and unknown to enrich themselves through fraud by, among other things, providing false information to the VA about the education that their respective schools would be providing or did provide to VR&E program veterans in order to obtain inflated payments.

B. **Manner and Means of the Scheme**

   19. The manner and means of the scheme included, but were not limited to, the following:

      I. **The Atius Scheme**

   20. In or about August 2015, KING and POAWUI agreed to commit bribery and to defraud the VA in order to enrich themselves. KING and POAWUI agreed that POAWUI would pay—and POAWUI did in fact later pay—KING a 7% cash kickback of all payments made by the

VA to Atius relating to veterans coming from the District of Columbia VA Regional Benefits Office in exchange for KING taking official acts to cause the VA to pay Atius. KING required that the bribe payments be made in cash to hide them from the Internal Revenue Service and to keep their scheme a secret, and POAWUI agreed to this condition.

21.  Under KING and POAWUI's agreement, KING's primary role in the scheme was to act in his official capacity to steer VR&E program veterans—both those directly under his supervision and those under the supervision of other VR&E program counselors—to Atius, and to approve Atius's invoices for payment. For his part, to maximize the scheme's profits, POAWUI sent and caused to be sent course schedules, invoices, and other information to KING and other VA employees that inflated the amount of time that students were attending Atius. KING approved these documents without regard for their accuracy, and in some instances knowing they were false, in order to maximize the profit that KING and POAWUI made from the scheme.

22.  KING continued to send veterans to Atius despite numerous complaints by Atius students to KING that the veterans were not receiving an adequate education at the school. Despite voluminous complaints of this nature from veterans about Atius, KING took no action to transfer the complainant students to another school, seek a refund from Atius for services paid for but not provided, or ensure that the veterans at Atius were receiving the education they were promised.

23.  From on or about September 15, 2015, to on or about May 5, 2017, the VA paid Atius approximately $2,217,391 for tuition, equipment, and supplies for veterans enrolled at Atius. The majority of these students were assigned to KING and enrolled at Atius at KING's direction. A small minority of these students were assigned to other VR&E Program counselors, such as PUBLIC OFFICIAL 1, but enrolled at Atius at KING's urging, direction, or instruction in KING's official capacity. KING solicited and received from POAWUI a 7% share of the VA's payments

for students from the VA District of Columbia Regional Benefits Office to Atius irrespective of whether the payment was made for a veteran officially assigned to KING or another VR&E program counselor in that office.

24. From in or about August 2015 to in or about December 2017, in exchange for KING's official acts and in furtherance of their scheme to commit bribery and defraud the VA, POAWUI ~~paid KING approximately $152,000~~. These payments were ~~made in cash and were~~ hand-delivered to KING, or to PERSON B to be passed on to KING, by POAWUI or KANNEH. POAWUI and KANNEH delivered these payments, and KING received these payments, knowing that the payments were bribes pursuant to POAWUI and KING's illicit agreement.

[Handwritten annotations: "SJC 10.16.18", "≈ 20,000 per ", "made cash payments to WRB KH 10-18-18", "10-18-18"]

25. To further their scheme and keep it a secret, POAWUI and ATIUS EMPLOYEE 1 knowingly made false representations on documents submitted to the VA. The documents described below were sent by POAWUI and ATIUS EMPLOYEE 1 via email to KING, PUBLIC OFFICIAL 1, other VA employees, and/or a VR&E centralized mailbox that was used to receive electronic invoices from VR&E program vendors. For example:

   a. POAWUI and ATIUS EMPLOYEE 1 certified on VA Form 28-1905s that veterans attending Atius were enrolled in between eighteen and thirty-two hours of class per week when in fact both POAWUI and ATIUS EMPLOYEE 1 knew that Atius only offered a maximum of six hours of class per week for the courses listed on the form. POAWUI and ATIUS EMPLOYEE 1 made these false representations to obtain a "full-time" designation for these veteran students, thereby fraudulently increasing the amount of money that Atius could charge the VA for each veteran student.

   b. Similarly, POAWUI and ATIUS EMPLOYEE 1 submitted class schedules to the VA that included dates and times during which classes were not offered at all.

c. ATIUS EMPLOYEE 1, sometimes at POAWUI's direction, submitted to the VA "Certificates of Completion" for students who had not completed the courses listed on the certificates.

d. KING approved the payments for Atius students without regard to the accuracy of the forms that were being provided by Atius, and knowing or having reason to know that they contained material, false information concerning the amount of class hours that the veterans were receiving.

## II. King and Poawui's Efforts to Hide the Atius Scheme and Obstruct the VA's Administrative Investigation

26. By no later than February 2017, the VA had initiated an administrative fact-finding inquiry into Atius based on complaints by students as to the quality of education at the school. By July 2017, the VA had suspended making payments to Atius based on the preliminary findings of this inquiry. KING and POAWUI were made aware of the VA's inquiry into Atius by no later than July 2017, and both were aware of the suspension of payments from the VA to Atius.

27. Among the responsibilities of VR&E program counselors was to periodically conduct site visits at the counselors' assigned VR&E vendor schools. In particular, a VR&E program counselor was required to conduct a site visit when a school opened a new location that would receive veterans. KING never conducted a site visit of either Atius location and only went there in order to retrieve bribe payments. On or about August 14, 2017, during a meeting between KING and POAWUI at KING's apartment, KING handed POAWUI a printed report KING had created earlier. The report falsely stated that KING had performed a site visit at Atius's Springfield, Virginia, location in January 2017, prior to POAWUI receiving VR&E program veterans at that location. KING instructed POAWUI to send the report to another VA employee who was responsible for approving schools as VA vendors. KING created this document, and

instructed POAWUI to send it to the VA, to cause the VA to falsely believe that KING had performed a required site visit prior to Atius opening its second location in Springfield, Virginia. The purpose of KING's conduct in this respect was to obstruct the VA's inquiry into Atius and to ensure that the VA would resume paying Atius's invoices.

28. On October 11, 2017, ATIUS EMPLOYEE 1—at POAWUI and KING's direction—emailed a VA official who was KING's superior, stating that Atius would no longer offer day classes, even though POAWUI, ATIUS EMPLOYEE 1, and KING knew that Atius never offered day classes in the first place. The purpose of this email was to conceal the truth about material misrepresentations that POAWUI and ATIUS EMPLOYEE 1 had previously made to the VA concerning Atius course schedules, and to ensure the continued approvals of Atius's invoices.

### III. Witness Tampering Involving Atius

29. On January 17, 2018, POAWUI and KING met in KING's car, which was parked in a parking lot outside a Dunkin Donuts in Hanover, Maryland. POAWUI was meeting with KING at the request of the government's investigators and was wearing a recording device provided by the investigators. By this point, KING had been interviewed by agents with the Federal Bureau of Investigation and Department of Veterans Affairs – Office of Inspector General, and was told by those agents that the government was investigating matters involving Atius and the VR&E program.

30. During the conversation, POAWUI told KING that he "ended up not [interviewing with the government] because the subpoena said you can provide the records," but that he would need to appear in response to a subpoena.

31. POAWUI further stated that he was worried about being asked questions concerning a Google Wallet payment that he had made to KING. KING responded, "That was,

that was definitely a personal loan that I made to you. . . . Just, just paying back a personal loan." KING then proposed that POAWUI "say [KING] purchased, purchased a computer from you because you got it at a discount, discount rate . . . if they ask." KING then suggested that the computer involved in the transaction was a "Dell computer." In fact, KING and POAWUI had never entered a loan or sold each other a computer. KING made these statements with the intent to cause POAWUI to testify falsely to the grand jury.

32. POAWUI also raised the issue of PERSON B visiting Atius. KING stated that PERSON B "came in that one time with me for the site visit, he came back, time after time about you know, he wanted to learn about the program." In fact, as both POAWUI and KING well knew, PERSON B had visited Atius solely for the purpose of retrieving bribe payments for KING. KING made this statement with the intent to cause POAWUI to testify falsely to the grand jury.

33. During this same conversation, KING also recounted that he had spoken with PUBLIC OFFICIAL 1 about the investigation. According to KING, when PUBLIC OFFICIAL 1 confronted KING about being paid by POAWUI, KING told her that "none of that ever happened, never been paid by this man, never had any money transferred between us." KING made this statement with the intent to cause PUBLIC OFFICIAL 1 to lie to government investigators.

IV. The Eelon Scheme

34. In or about 2014, KING and PERSON B met with STEVENS at 3611 Branch Avenue, Suite 207, Temple Hills, Maryland. During this meeting, KING proposed to STEVENS that STEVENS open a school that would be approved by the VA to serve as a vendor for the VR&E program. KING explained to STEVENS that veterans would attend STEVENS' school and that their tuition would be paid to STEVENS by the VA. STEVENS was not operating any school of any kind at this time. At a subsequent meeting between KING and STEVENS, in or

about early 2016, STEVENS agreed to begin the process of creating a school to serve as an approved vendor for the VR&E program.

35.   STEVENS first became a certified VR&E vendor on March 22, 2016, using the school name Eelon Wellness and Massage. KING, in his official capacity as a VR&E program counselor, initiated and facilitated the vendor approval process for Eelon Wellness and Massage. At this time, Eelon Wellness and Massage was not operating as a school and did not have any students.

36.   On or about July 1, 2016, KING enrolled PERSON B in Eelon Wellness and Massage's "Health Practitioner" course. When PERSON B enrolled at Eelon Wellness and Massage, he was the only student at the school. On or about June 27 and July 1, 2016, STEVENS prepared and sent to KING invoices reflecting the costs and planned course of study for PERSON B's course. In these documents, STEVENS purposely inflated the hours of class that PERSON B would attend. STEVENS represented that PERSON B would attend class for approximately forty hours per week, when in actuality PERSON B attended no more than eight hours of class per week. KING approved these invoices for payment without regard to whether the class hour information was accurate.

37.   On or about September 2, 2016, STEVENS received by electronic transfer a tuition payment from the VA for PERSON B's Health Practitioner course tuition in the amount of $28,100. In or about September 2016, STEVENS called KING by telephone and asked how she could "bless" him in return for facilitating the VA's payment of PERSON B's tuition. KING responded that she should pay him seven percent of the monies paid by the VA to STEVENS.

38.   In or about September 2016, following her conversation with KING regarding their bribery agreement, STEVENS met KING at his office located at 1722 Eye Street N.W.,

Washington, D.C., and handed him $1,500 cash. The sole purpose of this payment was for KING's official acts in facilitating the payment of funds from the VA to STEVENS.

39. In or about April 2017, STEVENS renamed her school Eelon Training Academy and refashioned it as a school purporting to provide "digital media" classes. To that point, no one had attended Eelon Wellness & Massage as a tuition-paying student other than PERSON B and STEVENS' son.

40. In or about March 2017, STEVENS met KING in a parking lot near Arundel Mills Mall in Hanover, Maryland, and handed KING $1,500. The sole purpose of this payment was KING's fee in return for his official acts to facilitate the payment of funds from the VA to STEVENS.

41. Between in or about June 2017 and in or about January 2018, KING enrolled a total of seven students, including PERSON B, in Eelon Training Academy, purportedly to take a digital media course. STEVENS knowingly submitted, and KING knowingly processed and approved, paperwork inflating the number of weekly class hours that STEVENS planned for students to attend class in an effort to achieve a "full-time" designation for the students. For example, STEVENS represented to the VA that students would be attending class for forty hours per week, knowing that in fact they would attend class for a maximum of eight weekly hours. And, in fact, several of the students did not attend the majority of the scheduled class sessions due to the poor quality of the education provided by Eelon Training Academy and the building frequently being locked and vacant on scheduled class days.

42. In furtherance of the scheme to bribe KING and defraud the VA, and in an attempt to maximize her profits from the scheme, STEVENS submitted invoices to the VA amounting to

no less than $300,000 for the tuition and equipment for these seven students. Of the over $300,000 that STEVENS charged the VA, the VA paid approximately $83,000 directly to STEVENS.

43. The balance of the payments charged to the VA by Stevens were not paid by the VA due to the VA's ongoing administrative investigation into Eelon following complaints by students about the poor quality of education at Eelon.

### V. The School A Scheme

44. Between in or about August 2015, and in or about November 2016, KING enrolled fifteen veterans in physical security classes at School A.

45. KING approved invoices and facilitated the payment of over $340,000 in VA funds to PERSON A for the purported education of these fifteen veterans.

46. In exchange for KING's official acts of enrolling veterans at School A, approving School A invoices, and facilitating payments from the VA to School A, Person A made cash payments to KING.

47. In order to obtain the VA funds, PERSON A sent to KING materially false information concerning the quantity and type of education that would be or was provided to the fifteen veterans. For example, PERSON A filled out, signed, and sent to KING VA Form 28-1905s indicating that veterans would be enrolled in forty hours of class per week and would receive a total of 640 hours of class. In fact, School A's classes were not set up to provide more than eight to ten hours of class weekly, and most students went to only several classes before dropping out due to the poor quality of instruction provided. Veterans frequently arrived at School A to find the building locked and that class had been "cancelled" without warning.

48. PERSON A created and sent to KING dozens of "Certificates of Completion" indicating veterans had completed courses that they did not take in the first place.

49. KING facilitated the payment of VA funds to PERSON A knowing that the students KING sent to School A were not receiving the education that was reflected in the above-described documents.

## VI. King's Deceit and Manipulation of Veterans

50. In order to maximize the profit of the schemes for its participants, and further enrich himself, KING repeatedly lied to veterans in order to convince them to attend Atius, Eelon, or School A. For example:

   a. KING told one veteran that she could not pursue her preferred course of study in accounting and had to attend information technology courses at Atius instead because she had failed a class in college prior to enrolling in the VR&E program. No such limitation existed either in terms of VR&E program regulations or otherwise.

   b. KING told another veteran that he had to attend Atius, and then later Eelon, because he was on probation in an unrelated criminal matter. No such limitation existed either in terms of VR&E program regulations or otherwise.

   c. A third veteran assigned to KING had been a cook in the Navy and told KING that he wished to pursue his dream of becoming a professional baker. This veteran also told KING that he had to travel abroad for a planned family obligation and would be returning in approximately two months. KING told the veteran that he had to attend School A or else his VR&E benefits would lapse. That assertion was false, as shown by the fact that KING assigned numerous other veterans to Atius and Eelon courses that did

not start until several months after they first met with KING and entered the VR&E program. KING insisted that this veteran enroll in School A despite the veteran's protests that he could not engage in physical security work due to a physical disability.

C. Use of Interstate Wires to Execute the Scheme

51. On or about the date listed below, KING, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted or caused to be transmitted by means of wire communication in interstate commerce, the following writing, signal, and sound; that is, he caused:

| Count | Date | Description |
|---|---|---|
| One | September 2, 2016 | Electronic wire communication for payment processing of U.S. Treasury funds, originating in Austin, Texas, going to Kansas City, Missouri, for the payment of $28,100 by the U.S. Treasury to Eelon Academy's TD Bank account, ending in 4728. |

52. The defendant admits that the proceeds he personally obtained as a result of the offenses described above have been dissipated by him and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court.

By:

James Edwin King
Defendant

William R. Buie III
Counsel for Defendant

15